Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/05/2025 08:07 AM CST

Brent Sebade, in his individual capacity and
derivatively on behalf of Sebade Brothers, a
Nebraska partnership, appellee, v. Rick Sebade
and Sarah Sebade, appellants.

___ N.W.3d ___

Filed December 5, 2025.    No. S-24-902.

1. **Judgments: Appeal and Error.** In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party.

2. **Trial: Witnesses: Evidence: Appeal and Error.** In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony; an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.

3. **Equity: Appeal and Error.** In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Limitations of Actions.** Which statute of limitations applies is a question of law.

5. **Limitations of Actions: Appeal and Error.** The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the trial court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.

6. **Motions for New Trial: Judges: Words and Phrases: Appeal and Error.** An appellate court reviews the denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

7. **Limitations of Actions: Fraud: Words and Phrases.** "Discovery," in the context of statutes of limitations, refers to the fact that one knows of the existence of an injury or damage and a wrongful act. Discovery can be actual or constructive. Constructive discovery occurs when the party discovers facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead the person to discover the fraud.

8. **Limitations of Actions: Fraud.** An action for fraud does not accrue until there has been a discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead to such discovery.

9. **Limitations of Actions: Notice.** Whatever fairly puts a person on inquiry is sufficient notice for discovery in the context of statutes of limitations, where the means of knowledge are at hand; and if the plaintiff omits to inquire, the plaintiff is then chargeable with all the facts which, by a proper inquiry, might have been ascertained.

10. **Notice.** Notice of facts that under the circumstances would lead an ordinarily prudent person to make an examination which, if made, would disclose the existence of other facts is sufficient notice of such other facts.

11. **Limitations of Actions.** If a fraud or mistake ought to have been discovered, the statute of limitations will run from the time discovery ought to have been made.

12. **Limitations of Actions: Fraud: Proof.** Where an action is brought for relief on the ground of fraud after the lapse of 4 years from the date of a fraudulent transaction, it is the plaintiff's burden to allege and prove facts as to the failure to discover the fraudulent transaction and prosecute within 4 years.

13. **Appeal and Error.** An appellate court has the discretion to affirm, as it deems appropriate, a correct result that was reached below for the wrong reason.

14. **Fraud: Proof.** To prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed

the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as a result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.

15. ____: ____. A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.

16. **Contracts: Compromise and Settlement.** A settlement agreement is subject to the general principles of contract law.

17. **Contracts: Parties: Compromise and Settlement.** To have a settlement agreement, there must a definite offer and an unconditional acceptance. A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract.

18. **Compromise and Settlement.** The law favors and encourages settlements, and in the absence of fraud, error, or mistake, they should not be set aside.

19. **Principal and Agent.** The scope of an agent's authority is a question of fact.

20. **Expert Witnesses.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

21. **Conspiracy: Words and Phrases.** A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.

22. **Conspiracy: Torts: Proof.** A claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff.

23. **Actions: Conspiracy.** A civil conspiracy is actionable only if the alleged conspirators actually committed some underlying conduct.

24. **Conspiracy: Torts.** A conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort.

25. **Conspiracy: Aiding and Abetting: Liability.** Liability for civil conspiracy is in substance the same thing as aiding and abetting liability.

26. **Actions: Aiding and Abetting.** A claim of aiding and abetting is that in addition to persons who actually participate in concerted wrongful action, persons who aid, abet, or procure the commission thereof are subject to civil action therefor.

27. **Actions: Conspiracy: Aiding and Abetting: Liability.** Claims of civil conspiracy and aiding and abetting are essentially methods for imposing joint and several liability on all actors who committed a tortious act or any wrongful acts in furtherance thereof.

28. **Actions: Conspiracy: Aiding and Abetting: Torts.** Like conspiracy, aiding and abetting is not a tort in itself and requires an underlying actionable tort to be actionable.

29. ____: ____: ____: ____. Without an underlying tort, there can be no cause of action for conspiracy to commit a tort or aiding and abetting the commission of a tort.

30. **Contracts: Fraud.** A party to a business transaction can be liable to another party for failing to disclose a fact that he or she knows may justifiably induce the other to act or refrain from acting in the transaction, but only if the nondisclosing party was under a duty to the other to exercise reasonable care to disclose the fact at issue.

31. **Fraud.** While mere silence cannot constitute fraudulent misrepresentation absent a duty to disclose, half-truths can.

32. ____. Under fraudulent misrepresentation, to reveal some information on a subject triggers the duty to reveal all known material facts.

33. **Statutes.** Statutes effecting a change in the common law should be strictly construed.

34. **Breach of Contract: Torts.** The question of when a claim is one for breach of contract and not a tort is dependent upon whether the gravamen of the claim is a failure to perform a duty arising out of an agreement between the parties as opposed to a duty fixed by law independent of the contract.

35. **Appeal and Error.** Mere citation to a case does not specifically argue every point of law discussed therein.

36. **Election of Remedies.** Pursuant to the doctrine of election of remedies, a party pleading inconsistent theories of recovery may be required to elect between them.

37. **Actions: Equity.** A remedy in equity is inconsistent with a remedy at law, because a suit in equity will not lie when the plaintiff has a plain and adequate remedy at law.

38. **Contracts.** A theory of recovery premised on the existence of a contract is inconsistent with a theory premised on the lack of a contract.

39. **Actions: Election of Remedies.** Election of remedies does not preclude a plaintiff from pursuing two causes of action where each action arose out of different obligations and different operative facts.

40. **Actions.** Where several claims are asserted against several parties for redress of the same injury, only one satisfaction can be had.

41. **Appeal and Error.** An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.

42. **Contracts: Words and Phrases.** A condition precedent includes a condition which must be fulfilled before a duty to perform an existing contract arises.

43. **Contracts: Intent: Words and Phrases.** Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract.

44. **Appeal and Error.** In order to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.

Appeal from the District Court for Thurston County: Zachary L. Blackman, Judge. Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellants.

Joshua C. Dickinson and Shilee T. Mullin, of Spencer Fane, L.L.P., and Scott C. Sandberg, pro hac vice, for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

This case concerns a business partnership owned and operated by two brothers, which business consisted mainly of farming and raising feeder cattle. The partnership records were kept by one brother and his daughter. The partnership fell apart when the other brother discovered accounting discrepancies that led him to file the present lawsuit. In the lawsuit, that brother sought judicial dissolution and damages for alleged breaches of partnership duties, fraudulent concealment, fraudulent

misrepresentation, negligent misrepresentation, unjust enrichment, conversion, and breach of contract. Following a bench trial, the district court found for the brother who did not have access to the partnership records. We affirm.

## II. BACKGROUND

Rick Sebade and Brent Sebade are brothers and were partners in a farming and feeder cattle business until October 2020. Their business was known as Sebade Brothers or Sebade Farms. Rick started farming and raising livestock with their father in the 1980s. In the 1990s, Brent returned from college and joined the business. Their father eventually retired from the business in the late 1990s.

The business expanded, and the brothers were engaged in crop farming, raising feeder cattle for slaughter at various feedlots across northeastern Nebraska, and reselling distiller's grain from ethanol plants. In conjunction with these activities, the brothers owned three limited liability companies: Sebade Trucking, L.L.C.; Bancroft Custom Feeders, LLC; and Bancroft Grain, LLC. The brothers split up work for the business. Brent handled the "outside" work, and Rick handled the "office" work, including buying and selling cattle.

When Rick was working with his and Brent's father, Rick developed a system of handwritten records. During the relevant time periods, there were three main handwritten records: the "Cattle Inventory," the "Cattle Ledger," and the "Feed Ledger." The Cattle Inventory kept track of the partnership's cattle, which feedlots they were being fed at, and who had what interest in the cattle. The Cattle Ledger kept track of Rick's and Brent's payments for cattle purchases. The Feed Ledger kept track of Rick's and Brent's payments for cattle feeding expenses.

During the period in question, Rick's daughter, Sarah Sebade, worked as the office manager and bookkeeper for the brothers. Sarah kept the Feed Ledger and Cattle Ledger at her desk and was responsible for making entries in each ledger during the

course of her work. Rick kept the Cattle Inventory in his office, at his desk during the day and in his safe at night.

Rick, Sarah, and Brent all worked out of the office at an Emerson, Nebraska, feedlot until the partners' split in October 2020. Brent would, from time to time, receive copies of the three handwritten records for his review. On the Cattle Inventory, Rick's and Brent's ownership interests would be labeled simply as "Sebades."

The brothers had a joint bank account at First Northeast Bank of Nebraska (FNBN) in Lyons, Nebraska, under the name "Sebade Brothers." The brothers also each had individual accounts at FNBN. For partnership expenses, the brothers did not pay for them out of the joint bank account. Instead, the brothers would take turns covering purchases of cattle and feed bills out of their individual accounts. These turns would be noted on the handwritten ledgers kept by Sarah.

For Rick's expenses, Sarah would write out and sign checks from Rick's account. For Brent's purchases, Brent would supply Sarah with a stack of presigned checks on which Sarah would fill out the payment information and send. The purpose of this back-and-forth system was to keep payments by the brothers relatively equal between them. At the end of each year, Sarah would total each brother's payments for the year. Whichever brother had covered less of the expenses would have his total reduced to zero, and the other brother would receive a credit going into the next year.

In addition to Rick and Brent's ownership in feeder cattle, from time to time, two of Rick's children (Sarah and Cory Sebade) and Brent's three children (Jacob Sebade, Justine Lallman, and Joshua Sebade) had percentage ownership interests in cattle in different feedlots. The children were expected to pay their portions of the purchase prices of the cattle and the feed costs associated with the ownership interests. The children would then receive their shares of the proceeds from the sale of the cattle. The proceeds were paid out from the brothers' joint FNBN account.

Rick's grandson Braxten Sebade, who was a minor, also received an ownership interest in certain cattle as decided by Rick and Sarah. Braxten is the child of one of Rick's sons who was not involved in the partnership's business. Braxten's feed bills and proceeds were handled through accounts shared by Rick and Sarah, first at FNBN and then at Charter West Bank. Braxten's interests in the cattle were recorded in the Cattle Inventory kept by Rick. The copies of the Cattle Inventory provided to Brent, however, did not show Braxten's interests. As a result, Rick's and Brent's interests on those specific cattle pens were shown on the original Cattle Inventory as 40 percent but shown as 50 percent on the copies provided to Brent.

During the course of the partnership, Rick engaged in commodities trading through joint commodities trading accounts with two other individuals during the relevant time. Rick did not have a joint trading account with Brent and did not have a trading account in the name of the partnership. On Rick's brokerage account applications, Rick stated no other person or entity had an interest in the trading accounts. In 2020, Cory and Sarah each signed a power of attorney authorizing Rick to trade commodities for them. Rick did not have a power of attorney from Brent authorizing Rick to trade commodities for him.

During a review of the ledgers in 2018, Brent found missing entries and mathematical errors on his side of the ledgers totaling approximately $1 million. Brent had checked the entries on his side of the ledgers against his bank account to determine the extent of the errors but did not review Rick's side of the ledgers, the Cattle Inventory, or Rick's bank records during this time. When Brent brought the errors to Sarah's attention, she stated that she needed to check it out with Rick. She apparently did so and made the necessary corrections to the ledger.

Brent next noticed a problem in 2020, when the financial statements he prepared for FNBN showed a $7 million decline

in Brent's net worth tied to Sebade Brothers and Brent's line of credit. To maintain Brent's line of credit, FNBN asked Brent to provide it with documentation for a detailed review that might explain the reduction in his equity. The documentation required by FNBN included the Cattle Inventory, the Cattle Ledger, and the Feed Ledger.

Soon thereafter, Brent informed Rick that Brent wanted to end the partnership. Rick and Brent entered into a "Joint Cattle and Farming Liquidation Agreement" (Liquidation Agreement) in November 2020. The purpose of this agreement was "solely to memorialize the terms by which Rick and Brent will wind-down the joint cattle ownership, cattle feeding operation, and joint farming operation." Rick and Brent agreed that "[a]ll proceeds from the sale of the Cattle must be deposited into the Sebade Account [at FNBN]." Rick and Brent also agreed to split the remaining share of jointly owned soybeans. Rick was required to provide Brent with a full accounting from the sale of distiller's grain, and all proceeds were required to be deposited in the joint FNBN account.

In February 2021, Rick and Brent executed a "Property Valuation and Division Agreement." This agreement contained valuations and allocations of the former partners' real estate, trucking assets, Bancroft Custom Feeders assets, and Sebade Brothers assets at the Emerson feedlot. In this agreement, Rick and Brent agreed that

> upon closing of the allocation and any necessary transfer of all of the Property, Brent will owe Rick $75,011.58 as an equalization payment (the "Equalization Payment"). The Equalization Payment will not be made until the parties negotiate and complete a final sale of Brent's ownership in Sebade Trucking, . . . Bancroft Grain, . . . and Bancroft Custom Feeders . . . .

### 1. Pleadings

Brent, individually and derivatively on behalf of Sebade Brothers, filed a complaint against Rick and Sarah on

March 31, 2021. The complaint was later amended to add more detail. Brent's amended complaint alleged that Rick and Sarah controlled the books and accounting of the partnership, including the ledgers and Cattle Inventory. Brent alleged that he trusted Rick with the books and accounting for the partnership. In the amended complaint, Brent's claims against Rick and Sarah were breach of the partnership duties of loyalty and care, fraudulent and negligent misrepresentation, fraudulent concealment, conversion, unjust enrichment, breach of contract, and judicial dissolution. Brent alleged Sarah was jointly liable with Rick because Sarah engaged in a civil conspiracy with Rick and because she aided and abetted Rick's tortious conduct and breaches of contractual and partnership duties.

As relevant to the statute of limitations and Brent's claims for fraud, Brent's amended complaint identified numerous "fictitious or misleading" ledger entries. These entries date back to November 15, 2016. Brent asserted that the "false, misleading and fictitious" payments Rick purported to make were not within Brent's reasonably diligent attention, observation, or judgment. Brent asserted that Rick and Sarah controlled the books and accounting for the partnership and that Brent trusted Rick with the assets of the partnership. Brent claimed that, by concealing the true nature of the ledger entries, Rick and Sarah intended for Brent to make more than his fair share of payments. Brent asserted he reasonably relied on what Rick and Sarah represented on the ledgers. Brent alleged that on or about October 1, 2020, Rick provided copies of certain pages from the ledgers, the review of which revealed several suspicious transactions and entries.

Rick and Sarah answered, asserting several defenses, including the statute of limitations, laches, accord and satisfaction, release, and estoppel. Sarah asserted counterclaims against Brent for compensation for Brent's use of semi-truck trailers and for compensation for alleged unpaid work she performed. Rick asserted counterclaims for breach of contract against Brent and entitlement to shares in the three limited liability

companies—Bancroft Grain, Bancroft Custom Feeders, and Sebade Trucking; entitlement to funds from the sale of cattle; entitlement to compensation for soybeans; and entitlement for payments made for feed, equipment, and labor. Brent answered Rick's amended counterclaims, generally denying the allegations and incorporating Brent's claims and allegations from his amended complaint.

## 2. Bench Trial Testimony and Evidence

In June 2024, the district court held a 4-day bench trial. The court heard testimony from seven witnesses and received numerous exhibits. We summarize the evidence on issues pertinent to this appeal.

### (a) Brent

Brent testified about the nature of the partnership with Rick, Sarah's role, and the day-to-day operations of the business, as outlined above. According to Brent, the "outside" work he did included running the Emerson feedlot, running the crop production side of the partnership, and handling matters for Sebade Trucking. Brent testified that, as a result, he was not in the office much during the day, but more so in the evenings.

Brent testified that Rick handled the finances for the partnership, including buying and selling cattle, which he kept record of in the Cattle Inventory. Rick was solely responsible for making entries in the Cattle Inventory, and he kept it locked in a safe in his office, which safe Brent testified he did not have the combination to.

Brent described how Sarah was primarily responsible for making entries in the two ledgers, writing checks for Rick to cover Rick's expenses, and filling out presigned checks supplied by Brent to cover his expenses. Brent explained that the partnership would receive monthly feed bills from feedlots where they fed cattle and that when the cattle were finished, the partnership would receive a closeout. A closeout is a

summary of the performance of the cattle, cost of the cattle, weight of the cattle, number of head of cattle, death loss, and profit and total revenue of the cattle. Brent described how Sarah would keep track of the running totals between the brothers and how, to try and keep things even, she would "take the total of [the brother who had paid fewer of the expenses] and move it to zero" and give the other brother a credit to make up the difference. Brent testified that he generally did not review Sarah's calculations, look through the prior entries to ensure they were correct, or meet with either Rick or Sarah to discuss the calculations.

There were two exceptions where Brent did review his side of the ledgers. Brent explained that he reviewed his side of the ledgers in July 2018. This review consisted of checking for verified entries, missing entries, and looking for addition errors. Brent stated that he discovered addition errors amounting to about $1 million as already described. Brent testified that his 2018 review did not involve looking at Rick's side of the ledgers, the Cattle Inventory, or Rick's bank records. Brent stated that, after this review, Rick would tell him to talk to Sarah any time he had concerns about the ledgers.

Brent indicated it was only after FNBN alerted him in 2020 of the drastic change in his net worth that he became really concerned. This was especially true because, according to Brent, Rick was not forthcoming with partnership records, which were in Rick's possession. Further, Rick did not seem concerned, and Brent was not getting any answers from Rick. When Brent pressed Rick for answers, Rick would either ignore him or ask, "[D]on't you trust me?" Brent testified that he had trusted Rick until then.

Brent informed Rick of his intention to end the partnership. Brent testified he was able to make copies of only some of the partnership records before Rick and Sarah removed the records from the Emerson office. Brent testified that he did not discover most of Rick's and Sarah's actions until after the lawsuit was filed and he was able to obtain discovery.

Brent stated that there were electronic records stored in the Emerson office, but Rick and Sarah never supplied those records, apparently due to the destruction of Sarah's computer by an ice storm. According to Brent, these electronic records included bookkeeping software records used for billing on the distiller's grain business and for keeping track of checks and invoices.

### (i) False Ledger Entries

Brent testified that, after making copies of the ledgers following the partners' split, he discovered that on the Feed Ledger, Rick had been given credit for a $488,000 feed bill payment to Bancroft Custom Feeders in 2016 that did not correspond to any feed invoice or to any payment from Rick's bank accounts. In fact, Brent's checking account records showed that he made two payments to Bancroft Custom Feeders during that time, one for $221,591.46 and one for $246,694.67. A similar discrepancy on Rick's side of the Feed Ledger was found with a January 2016 entry listed as paid to Pierce County Feeders, where the actual payment of $470,000 was made to one of Rick's commodities accounts rather than for feed.

Brent also learned that Braxten's ownership in cattle was omitted from the copies of the Cattle Inventory that he received. Brent discovered this by comparing copies of the original Cattle Inventory he had received through discovery with the copies he received from Rick and Sarah during the course of the partnership. On Brent's copies, there was no ownership interest for Braxten indicated, while the copies of the originals showed a 10-percent interest for Braxten. Brent also testified he discovered that Braxten's portion, as well as Sarah's portion, of the feed expenses was not fully paid.

Brent testified commodities trading was not part of the partnership business. Brent explained that he had never hedged jointly owned cattle or jointly owned crops. Brent acknowledged that he had a commodities trading account, which he explained he opened with his son Jacob to help him out, but it

did not involve the partnership. Brent explained that he never had a joint trading account with Rick, never signed a power of attorney for Rick to trade on his behalf, and never discussed commodities trading with Rick. Brent also explained that he did not recall ever seeing an indication of profit or loss from hedging on any closeouts from any feedlots where the partners fed cattle.

Brent admitted on cross-examination that he incorrectly put on his financial statement to the bank that he had made $1.6 million in 2017. Brent explained that the numbers he gave FNBN on financial statements was based on what Rick would tell him.

### (ii) Distiller's Grain Sales

Brent explained the partnership's distiller's grain business. The normal procedure was that distiller's grain would be purchased out of the partnership's joint FNBN account and hauled by Sebade Trucking from the ethanol plants to either the partnership's feedlots or third-party customers. Sarah would send invoices, and the payments would be made to the partnership's joint FNBN account. Brent detailed how he discovered after filing suit that, since before the October 2020 split, Rick and Sarah had been diverting funds from the sale of distiller's grain that were partnership proceeds subject to the 50-50 split under the Liquidation Agreement. He also learned that around the same time, in May 2020, Rick, without informing or consulting Brent, had applied for a trade name of Sebade Farms. It is unclear if Rick was successful in obtaining this trade name. In conjunction with this application, Brent learned that Rick opened a new account at Liberty National Bank in May 2020 under the name "Sebade Farms." Brent also learned that Sarah instructed a distiller's grain customer to begin making their checks out to "Sebade Farms" rather than "Sebade Brothers" as before.

Records from the Liberty National Bank account, which were entered into evidence at trial, showed that the distiller's

grain customers began making payments into that account, rather than the joint Sebade Brothers account at FNBN in 2020, before the partners split. Records also showed that Rick began writing checks to cover ledger expenses out of the Liberty National Bank account, which contained partnership funds from the sale of distiller's grain.

Brent testified that, unbeknownst at the time to Brent, Rick also opened an account at Farm Credit Services toward the end of 2020. Records for the Farm Credit Services account, entered into evidence at trial, show that the distiller's grain payments covered under the Liquidation Agreement were deposited in this account as well.

### (iii) $900,000 Withdrawal

Brent discussed how Rick and Sarah also diverted other partnership funds. Brent testified that he learned during discovery that Rick took a $900,000 withdrawal from the partnership's joint FNBN account in May 2017. Brent explained that Rick did not return the $900,000, Brent never took a matching $900,000 withdrawal, and Brent never received a half share of the $900,000 withdrawal. On cross-examination, Rick's counsel asked Brent if the $900,000 withdrawal was for a margin call, but Brent testified that he did not know and knew only that the money ended up in Rick's account.

### (iv) Postsplit Distributions

Brent discussed the partnership's split and the windup agreements. Brent testified he discovered some of the proceeds from cattle sold under the Liquidation Agreement were not deposited into the partnership's joint FNBN account, as required by the agreement. Instead, approximately $1.7 million worth of cattle proceeds were placed in a trust account belonging to Rick's attorney at the time. Of that $1.7 million, Brent stated, $696,000 was due to him under the terms of the agreement.

Finally, Brent testified he did not receive his share of the agreed-upon 50-50 split of the remaining partnership soybeans.

According to Brent, he received 2,782 bushels fewer than the half he was to receive. Brent testified that, at $14.02 per bushel, this damaged him by $39,000. On cross-examination, Brent explained that he compared his scale tickets with Rick's to determine his shortage. Brent denied that there was a difference in quality of soybeans between what he took and what Rick took from the grain bins.

(b) Rick

At trial, Rick agreed that the partnership was based on trust. Rick recounted how he started farming with his and Brent's father and how the business expanded over the years, including how his recordkeeping system developed. Rick explained the partnership's recordkeeping system in much the same way as Brent. Rick described how feed bills were handled. He testified he reviewed and approved the bills and Sarah would decide which brother's check covered the specific bill. Sarah would make entries in the ledgers based on information she received from Rick. Rick testified that he kept his checking account records in a storage room in the upstairs of the office, so Brent could have accessed his checking account records. Similarly, Rick testified that, at the end of each year, the partnership records would be stored in plastic totes in the storage room of the office. Rick testified that he never refused to allow Brent to review the records.

In terms of commodities trading, Rick testified that he traded on behalf of the partnership. When asked why the trading account was only in Rick's name, Rick claimed that it was very difficult to have two people's names on a commodity trading account. On cross-examination, however, Rick admitted to having joint commodities accounts with people other than Brent.

Rick claimed that Brent discussed commodities trading with Rick when Brent came into Rick's office one morning to tell him that Brent's son Jacob would be handling Brent's hedging from then on. Rick could not remember exactly when this

conversation occurred. Rick testified that he did not hide his commodities trading from Brent but stated that they did not talk about the markets much. Rick did not testify about any other time he would have told Brent about the commodities trading. Rick acknowledged he made ledger entries in the Feed Ledger for commodities expenses but never discussed such entries with Brent.

Rick generally testified at trial that he split commodity trading profits with Brent. However, Rick stated in his deposition testimony, which he was confronted with, that he did not split commodities profits with Brent; instead, the profits went into Rick's account. When asked if that was still true, Rick admitted, "Probably, yes."

When asked about the $470,000 entry for Pierce County Feeders on Rick's side of the Feed Ledger, Rick could not explain why there was no corresponding invoice. Rick was then shown a $470,000 payment to "RJ O'Brien," a clearinghouse of the commodity board, for commodities trading around that same time and acknowledged that "RJ O'Brien [had no] relationship" with Pierce County Feeders.

The same was true of the $488,000 entry for Bancroft Custom Feeders, which was also listed on Rick's side of the Feed Ledger. Again, Rick acknowledged that this was an improper entry and should have reflected "RJ O'Brien" rather than "Bancroft Custom Feeders." Rick admitted that Brent, not Rick, had actually made two payments to Bancroft Custom Feeders during that time that added up to nearly $488,000. Rick also admitted he took credit for these payments in his discovery responses. Rick stated that Brent should have caught the error but could not explain how Brent would have done so when Rick's credit for two checks that Brent paid did not exactly add up to $488,000.

Rick explained that the $900,000 withdrawal from the joint account at FNBN was to cover a margin call in commodities trading. Rick explained an FNBN bank president knew about this transaction. On cross-examination, Rick could not confirm

if he told Brent about it. Rick did not testify as to why the joint partnership account was used to cover this margin call.

When asked about sale of distiller's grain, Rick admitted he switched incoming payments from the partners' joint account at FNBN to his new account at Liberty National Bank in May 2020 for himself. Rick also admitted he used the Liberty National Bank account to pay for feeder cattle and was credited for those transactions on the Cattle Ledger. Rick justified these actions, stating that Brent had the opportunity to do the same thing but did not.

(c) Sarah

Sarah described how she started working for the partnership, her roles within the partnership, and how the business was run. Sarah described the recordkeeping process for the partnership very similarly to Rick and Brent. For Rick, Sarah had signature authority to write checks on his account to cover partnership expenses. As for Brent, Sarah did not have signature authority but was given presigned checks by Brent whereon she could fill in the payee and amount. Sarah explained she would often cover larger expenses with Brent's presigned checks and the smaller expenses with Rick's checks, since she had signature authority for Rick. On cross-examination, Sarah acknowledged that she had made out one of Brent's presigned checks in the amount of $195,063.92 to "Roth Cattle and Land" in August 2020. Sarah admitted that this expense should have been entered on Brent's side of the Feed Ledger but was not. Sarah described how her day-to-day responsibilities included making entries in the two ledgers; keeping track of the brothers' expenses; and, roughly weekly, totaling the ledgers "to try to keep [the brothers] close."

Sarah confirmed that Brent received copies of the partnership records to review, not the originals. Sarah would make these copies when a page became full. Sarah described how Brent would review his side of the ledgers on the copies and bring any corrections for her to make. Sarah testified that, on

Rick's side, every month, she would go through and compare the ledgers to Rick's checking account statement.

On cross-examination, Sarah acknowledged that Brent had no role in managing the partnership's accounting or finances. Sarah also mentioned that Rick would sometimes report his ledger expenses to her verbally, rather than through an invoice, bill, or other document. One such verbal report was a $1,054,000 entry on the 2016 Feed Ledger for a commodity account. Rick also occasionally made entries in the ledgers himself. Sarah was asked about the $470,000 entry for Pierce County Feeders and the $488,000 entry for Bancroft Custom Feeders noted on Rick's side of the Feed Ledgers. Brent's counsel pointed out that those entries were identified by the certified public accountant (CPA) for Rick and Sarah, Clint Weeder, as commodities-related expenses. Sarah offered no explanation as to why these commodity-related expenses were reflected in the Feed Ledger.

### (d) Kurt Meisinger

Kurt Meisinger, a licensed CPA with experience in auditing partnerships and forensic accounting, testified as an expert witness for Brent. Meisinger spent approximately 250 hours examining the partnership records, bank account records, invoices, depositions, and other materials related to the operation of the partnership from 2016 through 2021.

Meisinger summarized that Rick had overstated his expenses on cattle purchases and feed and had diverted partnership funds to Rick's account, that Sarah had profited from not paying her fair share for cattle and feed, and that Rick and Sarah had both profited from Braxten's share of the cattle by either not paying their fair shares or receiving revenue in excess of their fair shares.

Meisinger found that, in total, Brent was damaged by $6,912,685.72, based on Rick's improper ledger entries, diversion of partnership funds to Rick's personal accounts, and nonpayment of proceeds from partnership cattle. Additionally,

Meisinger found that the partnership was damaged by $1,033,166.12, based on transactions related to Braxten, one-half of which was owed to Brent, and that Sarah's transactions resulted in $585,361.46 of damages to the partnership, again one-half of which ($292,680.73) was owed to Brent. Meisinger's testimony did not cover Brent's damages related to Rick's $900,000 withdrawal from the joint FNBN account, the deposit of $696,000 in proceeds from the sale of joint cattle under the Liquidation Agreement into a trust account, and Brent's disputed share of soybeans from the Liquidation Agreement.

### (i) Ledgers

Meisinger testified that to verify or find support for expenses recorded in the ledgers, he compared each entry to records from the various bank accounts used by the parties. Meisinger testified this method of verifying expenses is recognized in the field of forensic accounting. Based on Meisinger's examination, Meisinger found that overstatements on Rick's side of the Feed Ledger from 2016 up until the partners split in October 2020 totaled $10,792,968.65. Rick's Feed Ledger overstatements from 2016 alone totaled $9,104,376.11. This total was largely due to several large expenses that were actually commodities trading expenses, rather than feed expenses. On the 2017 Feed Ledger, Rick's overstatements totaled $2,810,865.94. Again, much of this total was owed to commodities trading, particularly to two margin calls recorded on the ledger in May 2017. On Brent's side of the Feed Ledger from 2016 until the partners split in October 2020, Meisinger found a total overstatement of only $190,372.36.

On the Cattle Ledger, Meisinger found that Rick's side was overstated by $756,536.61 and Brent's side was overstated by $235,411.16. In contrast, in 2016, Rick's side was overstated by just $10,124.52. In 2017, Rick's overstatement was $219,451.23, the majority of which was due to an unverified entry listed as "Greenville" in March 2017 for $214,634.07.

Meisinger testified that, after he disclosed to Rick the results of his examination of the ledgers, he never received any checks or statements to support the unverified entries.

Meisinger testified he did not consider any commodities trading losses as partnership losses because the information he reviewed showed that there were no trading accounts shared by Rick and Brent; Rick did not identify Brent or the partnership as having any interest in Rick's trading; and Brent did not grant a power of attorney for Rick to trade on his behalf.

### (ii) Braxten's and Sarah's Cattle

Regarding Braxten's and Sarah's interests in cattle, Meisinger's examination found discrepancies on their shares of feed costs and their fair shares of proceeds. Deposits showed, for example, that Braxten received $3,182,064.69 when he was owed only $2,448,422.62. These deposits began in August 2017. Sarah, in contrast, received less than she was owed for cattle proceeds, benefiting the partnership by $709,872.66.

Meisinger's examination showed that both Braxten and Sarah had underpaid for feed expenses. Meisinger's calculations found that Braxten's cattle discrepancies damaged the partnership in the amount of $1,033,166.12, half of which was owed to Brent. Sarah's cattle discrepancies damaged the partnership in the amount of $585,361.46, half of which was owed to Brent.

### (iii) Distiller's Grain Diversion

Regarding distiller's grain profit diversion, Meisinger explained that Rick was depositing partnership funds in his Liberty National Bank and Farm Credit Services accounts and using such funds to cover Rick's expenses on the ledgers. These deposits were found when Meisinger reviewed Rick's bank records beginning in May 2020, before the partners split, and through early 2021, covering deposits for partnership assets covered in the Liquidation Agreement. Meisinger

found that Rick had deposited a total of $1,302,422.28 of partnership funds into the Liberty National Bank account. Of that amount, $708,196.83 was deposited before October 5, 2020, when Brent informed Rick of his intention to end the partnership. Meisinger found that, beginning in December 2020, Rick deposited $518,674.64 of funds related to partnership invoices or revenue that belonged to the partnership into his personal Farm Credit Services account.

(e) Weeder

Weeder testified as an expert for Rick and Sarah. Weeder is a CPA. Weeder became Rick and Sarah's accountant in late 2020. Weeder testified he attempted to mirror the approach of Meisinger so that he could reach his own conclusions and then compare them to Meisinger's.

In contrast to Meisinger, however, Weeder included commodities trading deficits as a partnership expense. Meisinger apparently included commodities trading deficits because Rick asked him to; Weeder acknowledged that he assumed trading was part of the brothers' partnership for the purpose of his review.

On the Feed Ledger discrepancies, Weeder agreed with Meisinger's assessment that, without factoring in commodities expenses, Rick's side of the feed ledger was overstated by about $10 million. However, considering the commodities trading accounts, Weeder opined Rick would be owed $3.6 million.

On cross-examination, Weeder conceded that transactions related to commodities trading were reflected on the Feed Ledger as payments to feedlots and not as payments to commodities accounts. Weeder agreed that someone looking at the Feed Ledger could safely assume that the commodity payments were actually feed payments made to Pierce County Feeders, Bancroft Custom Feeders, and so on. Weeder acknowledged he did not see any of the partnership's feedlot closeouts that indicated a profit or loss for commodities trading other than zero.

Weeder also did not identify any specific lot or group of cattle that was hedged by Rick.

Another difference in approach was Weeder's use of Rick and Brent's Schedule F tax documents, rather than using the ledgers, inventory, and bank account records. A Schedule F is used to report farm income and expenses to the government. According to Weeder's review of the Schedule F documents, Brent's income from cattle was $1,404,057 more than Rick's from 2016 through 2020. On cross-examination, Weeder acknowledged that the brothers did not use Schedule F documents to determine amounts owed between them. Weeder also acknowledged that Schedule F documents do not show the whole picture and that determining the amounts required more analysis.

Weeder acknowledged that his review did not include Brent's side of the ledgers, Rick's accounts at Liberty National Bank and Farm Credit Services, invoices from Pierce County Feeders, or the distiller's grain part of the business. In other words, Weeder did not analyze whether Rick had diverted partnership assets from distiller's grain sales to Rick's personal accounts.

As a result of Weeder's review, he concluded that Brent owed Rick $596,798.77 in partnership damages. Weeder did not express an opinion as to whether, after Rick and Brent entered into the dissolution agreements, Rick had distributed partnership assets in accordance with those agreements.

Weeder concluded that Brent was owed a total $1,047,300.18 in relation to Braxten's, Sarah's, and Cory's cattle transactions. Between Rick and Brent, Weeder opined that Rick suffered partnership damages in the amount of $596,798.77, owing largely to the commodities trading expenses.

### (f) Judith Ackland

Judith Ackland was called to testify as an expert witness for Rick and Sarah. Ackland is an accountant who is a certified financial planner but is not a CPA. Ackland testified that she

has worked in the cattle business since 1993. Ackland testified that she was responsible for keeping records for a large feeder cattle operation.

Ackland did not conduct a forensic accounting analysis of the partnership records but presented more generalized opinions about the partnership's accounting practices in the broader context of cattle feeding operations. Ackland testified that Rick and Sarah's recordkeeping system did not follow accounting standards but was typical for a family-owned small cattle operation. Based on this recordkeeping, Ackland explained that there were risks of mathematical errors and forgetting to document transactions.

When asked about Rick and Brent's use of a single bank account, Ackland testified, "[I]f one brother was trying to do something devious, they would not be in the same bank." On cross-examination, Ackland acknowledged that she had heard that Rick opened a separate account at Liberty National Bank but stated that she did not review those records.

## 3. District Court's Judgment

The district court ordered judicial dissolution and, pursuant to the Property Valuation and Division Agreement, entered a monetary judgment for Rick to pay Brent $63,445.15, representing half of the net working capital of Bancroft Grain at the date of division, and $49,948.80, representing half of the net working capital of Bancroft Custom Feeders at the date of division. Pursuant to the Property Valuation and Division Agreement, the court awarded Rick all remaining assets in Bancroft Grain, Bancroft Custom Feeders, and Sebade Trucking.

Rick was denied relief on his remaining counterclaims. The court rejected Rick's counterclaim that Brent was liable to Rick in the amount of $75,011.58, pursuant to the Property Valuation and Division Agreement, because the condition precedent of the sale of Brent's ownership in the limited liability companies had not been negotiated. Sarah's counterclaims were also dismissed.

(a) Damages

The district court entered judgment in favor of Brent and against Rick and Sarah jointly and severally in the amount of $8,886,876.51 in damages, plus costs and postjudgment interest until satisfaction, under several theories of recovery and causes of action as set forth further below.

The $8,886,876.51 judgment comprised seven discrete sums, each corresponding to somewhat different acts and different time periods.

*(i) False Ledger Entries*

The largest of these sums was $5,878,967.66 for Brent's half of the partnership's damages from the false ledger entries. The court found that Rick had "devised an unorthodox accounting system . . . to document cattle ownership, purchase price, and sale price," which involved Sarah's keeping two handwritten expense ledgers, often in pencil. The court found that Rick had "exclusive control over the Partnership's financing and accounting" and that he also "exclusively controlled the [cattle] inventory," keeping it in a locked safe and allowing Brent to see only a copy rather than the original.

On Rick's side of the ledgers, the court found that Sarah verified expenses against Rick's checking account and wrote a checkmark next to entries verified. Because Brent had no way to access Rick's bank account information, the court found "Brent had no way to verify Rick's ledger entries."

For Brent's side of the ledgers, the court found that Sarah wrote presigned checks Brent provided to her for his account and entered the payees and amounts in the ledgers. The court found that "Sarah had complete control over Brent's side of the ledgers—deciding which expenses to pay and entering the expenses in the ledgers."

The court referred to Meisinger's and Weeder's expert testimonies that expenses and payments in the ledger should be verified with invoices and bank records. The court noted that both Meisinger and Weeder agreed that when one partner

entered unverified expenses in the ledgers, the other partner was damaged by having to match the unverified expenses with real money. And both experts, the court observed, had determined that Rick's unverified entries totaled over $10 million. The only difference in their ultimate calculations was due to Weeder's identifying ledger expenses as Rick's commodities trading losses and treating those losses as partnership expenses, unlike other unverified entries.

The court chose Meisinger's calculations over Weeder's after finding that Rick's commodities trading was personal, "had no place in the Partnership's business," and was not properly chargeable to the partnership. Thus, Rick's commodities trading losses were among the unverified entries supporting damages.

In support of this conclusion, the court found that Rick had never disclosed commodities trading losses or profits to Brent, which the court distinguished from account balances that Rick instructed Brent to include on financial statements for FNBN. Further, Rick never provided Brent statements from commodities trading accounts, and Rick kept all profits realized from his commodities trades for himself. The court pointed out that neither Rick nor his expert witnesses had identified any partnership profits gained or losses diminished by Rick's hedging. The court also highlighted that Rick denied to his brokerages that he was acting as an agent or that any other person or entity had an interest in the trading accounts; that the feedyard closeout statements confirmed that the partnership had placed no hedges on its cattle; and that Rick had not obtained a power of attorney to engage in trading, as he had done for his children, or opened a commodities trading account in the partnership's name or jointly with Brent, as Rick had with other people.

The court found Weeder's cross-referencing of ledger entries with commodities trades problematic for other reasons as well. The court pointed out that neither Weeder nor any other witness could identify any trades with respect to any partnership-owned

commodities. Furthermore, Weeder used all Rick's trades, even those owned with other people and even though Rick engaged in speculative nonhedging trades. Lastly, Weeder's analysis revealed that Rick misrepresented his commodities trading losses in the ledger as "feed payments" and then falsely took credit on the ledger for paying those expenses when Brent's checking account showed Brent had paid them.

### (ii) Rick's Withdrawal of $900,000 From Joint FNBN Account

The $8,886,876.51 judgment included $450,000, which was half of the $900,000 that Rick took in May 2017 from the joint partnership FNBN account with no corresponding withdrawal or distribution to Brent. The court found that the $900,000 withdrawal by Rick was not a valid partnership expense. While Rick testified that it was to cover a margin call at Rick's personal trading brokerage, the court had already found that commodities trading was not part of the partnership.

### (iii) Braxten Cattle Scheme

The $8,886,876.51 judgment also included $516,583.06 for Brent's half of the damages attributable to Braxten's concealed cattle interests. The court found that Rick and Sarah concealed from Brent a scheme by which they wrote Braxten's percentage interest, expenses, and proceeds in the inventory kept in the safe and then gave Brent a false copy of the inventory with Braxten's percentage erased. Rick and Sarah then deposited into accounts under Braxten's name amounts greater than Braxten's actual cattle proceeds. Also, Rick and Sarah did not pay Braxten's proportionate share of costs for cattle in which Rick and Sarah gave Braxten an interest, instead charging those amounts to the partnership. The deposits in excess of revenue for Braxten totaled $733,642.07, and they failed to pay $319,621.70 in expenses, less a $20,097.73 cost overpayment. The court agreed with Meisinger's determination that Brent was entitled to half these amounts, or $516,583.06.

### (iv) Sarah's Cattle Underpayments

The judgment included $292,680.73, the court having found that Sarah had failed to pay $585,361.46 of her agreed-upon percentage share of cattle in which she had an interest and that Brent was damaged by half that amount.

### (v) Distiller's Grain Profits Diversion

The judgment included $651,211.14, representing one-half of the $1,302,422.28 of partnership funds from distiller's grain sales that Rick diverted into the Liberty National Bank account before Rick and Brent entered into the Liquidation Agreement. The judgment included an additional $382,506.92, which was Brent's half of partnership funds from distiller's grain sales diverted by Rick after the Liquidation Agreement.

The court found that Rick had admitted at trial to the scheme whereby he diverted for his personal use all the partnership profits from the sale of distiller's grain to partnership customers, then used those funds to pay and get credit on his half of the ledgers for his share of the partnership expenses. Rick also attempted to reregister the partnership solely in his name around that time.

### (vi) Brent's Share of Cattle Proceeds, $696,000,
### Held in Rick's Attorney's Trust Account

The judgment encompassed Brent's share of cattle proceeds placed by Rick in his attorney's trust account after Rick and Brent entered into the Liquidation Agreement.

### (vii) Soybean Shortfall

Lastly, the court included in the $8,886,876.51 judgment $18,927 for the 2,700-bushel shortfall of the soybeans that Brent was supposed to receive under the Liquidation Agreement.

### (b) Theories of Liability and Causes of Action

The court then explained which conduct satisfied the elements of the different theories of recovery and causes of action set forth in Brent's complaint.

### (i) Unjust Enrichment and Breaches of Fiduciary
### Duties of Loyalty and Due Care

The court concluded that Rick and Sarah were jointly liable under unjust enrichment and breaches of partnership fiduciary duties of loyalty and due care by (1) making false or improper entries in ledgers, (2) misrepresenting commodities trading losses as "feed" expenses, (3) taking credit for expenses Rick never paid, (4) providing Brent with false cattle inventory copies with Braxten's interest erased, (5) concealing Braxten's interest and then underpaying expenses and overpaying revenues for that interest, (6) diverting distiller's grain revenues, (7) giving Rick credit for expenses paid with money diverted from partnership distiller's grain revenues, (8) attempting to use the "Sebade Farms" name for Rick's own purposes, (9) taking $900,000 from the partnership's joint FNBN bank account to cover his personal brokerage losses, and (10) generally failing to account to Brent and concealing his dealings.

### (ii) Conversion

The court found Rick and Sarah jointly liable under conversion through the following acts of wrongful dominion: (1) the false ledger expense payments, (2) diversion of Brent's half of the distiller's grain proceeds, (3) taking Brent's half of the $900,000 from their joint partnership account, (4) holding Brent's $696,000 in cattle proceeds from the Liquidation Agreement, and (5) failing to distribute Brent's full share of the soybeans under the Liquidation Agreement.

### (iii) Fraudulent and Negligent
### Misrepresentation

The court found that Rick and Sarah were jointly liable under both negligent and fraudulent misrepresentation by making false representations in the partnership ledgers, giving Rick credit for Rick's commodities trading expenses by falsely claiming them as feed expenses, giving Rick credit for

expenses associated with cattle groups never included in the partnership, giving Rick credit for expenses paid with money diverted from partnership distiller's grain revenues, and giving Brent inventory copies with Braxten's interest erased.

#### (iv) Fraudulent Concealment

The court found Rick and Sarah were jointly liable under fraudulent concealment by their actions concealing material facts about the ledgers, inventories, distiller's grain sale proceeds diversion, bank accounts, and disposition of partnership assets. The court elaborated that, in addition to partnership duties of full and accurate disclosure between Rick and Brent, "Rick and Sarah dealt with Brent in a relationship of extreme trust among family members." Brent relied on Sarah to truthfully enter and verify Rick's ledger entries, and "Brent had no way to know about the information Rick and Sarah concealed from him." The court further found:

> Brent had no access to the ledgers or to Rick's bank records, and Rick and Sarah led Brent to believe that Brent could trust them. So Brent relied on the facts as Rick and Sarah presented them, continuing to match ledger expenses and not question Rick's dealings.

#### (v) Breaches of Contracts

The court found that Rick and Sarah both breached contracts and were jointly liable for the breaches. Rick was found in breach of the Liquidation Agreement for failing to deposit all of the cattle proceeds in the joint FNBN account, for failing to deposit distiller's grain proceeds in the joint FNBN account, and for not abiding by the 50-50 soybean split. Sarah was found to have breached her contracts with the partnership by not paying her percentage share of cattle expenses.

### (c) Joint and Several Liability

The court's determination of joint and several liability for the damages caused by breaches of partnership duties, fraudulent

misrepresentation, negligent misrepresentation, fraudulent concealment, conversion, breaches of contracts, and unjust enrichment was founded in principles of civil conspiracy and aiding and abetting.

The court found relevant that Rick and Sarah had "complete control over the ledger and inventory entries." The court further described Rick's and Sarah's "coordinated efforts to misrepresent ledger entries in Rick's favor and to Brent's detriment, divert Partnership assets to Rick, [and] breach the Liquidation Agreement." The court elaborated, "Rick provided false ledger entries that Sarah entered in the ledgers, knowing the falsity and/or falsely check-marking her entry verifications. Sarah's checkmarks next to Rick's false entries ties [sic] her to those entries." Sarah had physically made the false feed-ledger payments on Rick's side of the ledger that were really Rick's commodities trading losses and checkmarked them as confirming verification.

The court found that Sarah participated in providing copies of inventories with Braxten's interest erased and ledger entries for "feed" that were, in fact, for Rick's commodities brokerage losses. The court found that Sarah, jointly with Rick, conducted all the transactions with respect to Braxten that used joint accounts to underpay expenses to the partnership and take excessive revenues from the partnership.

The court found that Sarah effectuated the distiller's grain revenue diversions. It said, "Rick diverted to his Liberty [National Bank] and Farm Credit [Services] accounts, and Sarah gave Partnership customers instructions aimed at effectuating and concealing the diversion." Sarah had also checkmarked those entries to show she verified them from the Liberty National Bank account. She had sent the invoices to partnership customers for the sales conducted through Rick's Liberty National Bank account and never produced them during discovery, claiming they were destroyed during an ice storm. The court also found that Sarah effectuated the cattle sale proceeds diversion to Rick's attorney's account.

### (d) Statute of Limitations

The court found that Rick and Sarah's affirmative defense of the statute of limitations may have merit as to those damages incurred more than 4 years prior to the filing of Brent's complaint under the claims for breaches of partnership duties, negligent misrepresentation, conversion, Sarah's breach of contract, and unjust enrichment. The court elaborated that Brent never asserted tolling for those claims, and the court made no findings on tolling.

The court found the statute of limitations respecting those damages under those claims was not dispositive, however, because the damages incurred before March 31, 2017, were not time barred under the claims of fraudulent misrepresentation and fraudulent concealment. The court explained that, under Neb. Rev. Stat. § 25-207(4) (Reissue 2016), the 4-year statute of limitations for a claim of fraud does not accrue until the discovery of the fraud. The trial court found that Brent did not discover the fraud until 2020 and that he commenced the action well within the 4-year statute of limitations.

### (e) No Accord and Satisfaction, Release, or Estoppel

The court also rejected Rick and Sarah's claim that Sarah's annual accounting action of zeroing out one side of the ledger gave rise to accord and satisfaction, release, and estoppel. The court found that when, at the end of each year, Sarah reduced the lower contributing partner's ledger column total to zero and entered the contribution difference in the other partner's column, she did not discuss the "math" involved with either Rick or Brent, and that the "math never involved ledger entry verification."

The court found no definite offer and unconditional acceptance as necessary for a settlement agreement. It also found that Brent lacked the information necessary to assess the risks and benefits of settling and to meaningfully decide whether to settle the controversy. The court reasoned that Rick and Sarah's

release defense was barred because "[t]he ledger transactions involved fraud, deceit, oppression, and unconscionable conduct by Rick and Sarah."

In denying the estoppel defense, the court found that Brent did not know of the false representations of brokerage losses as feed expenses, which were part of this annual accounting; Brent did not benefit from Sarah's "math"; and Rick and Sarah failed to show reliance on Brent's alleged acceptance of the annual accounting.

Further, the court found Rick and Sarah's counterclaims were barred under the doctrine of unclean hands from Rick and Sarah's generally fraudulent and unconscionable conduct. Indeed, the court found that Sarah's annual zeroing of the ledgers only harmed Rick by exacerbating the ledger overstatements with her incorrect calculations.

### 3. Rick and Sarah's Motion to Alter and Amend and Motion for New Trial

Following the district court's judgment, Rick and Sarah moved to alter and amend the judgment and for a new trial. Rick and Sarah asserted that the district court had made several incorrect legal and factual findings warranting alteration of the judgment. Rick and Sarah moved for a new trial without giving specific reasons warranting a new trial, but citing to Neb. Rev. Stat. § 25-1142(4) through (6) (Reissue 2016). After a hearing, the district court denied both of Rick and Sarah's posttrial motions. Rick and Sarah timely filed this appeal.

### III. ASSIGNMENTS OF ERROR

Rick and Sarah assign that the trial court erred when it (1) rendered judgment for Brent against Rick and Sarah and denied judgment for Rick and Sarah; (2) found that commodities trading, used by Rick to hedge all partnership cattle, was outside the partnership's scope, so hedging losses were Rick's alone and not shared by Brent; (3) found Rick had exclusive

control over partnership accounting and funds, including cattle inventory records; (4) found that Sarah had complete control over Brent's side of the cattle feeding ledgers and that Brent had no access to Rick's side; (5) found that all incorrect ledger expense entries should be charged against Rick and Sarah; (6) found an incorrect amount due for sums associated with Sarah's cattle and Braxten's cattle that were not reimbursed; (7) found unjust enrichment, an implied contract theory, when actual contracts and a partnership existed; (8) failed to find annual settlements releasing all matters for years prior to 2020, when the brothers separated; (9) failed to find Brent owed Rick $75,011.58 to conclude equalization of the brothers' Property Valuation and Division Agreement; (10) failed to find that claims for losses occurring more than 4 years before suit was filed were barred by the statute of limitations; (11) found that Sarah, an employee, was liable for partnership debt; and (12) failed to sustain Rick and Sarah's motion to alter and amend the judgment.

## IV. STANDARD OF REVIEW

[1] In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. After a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party.[1]

[2] In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony; an appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.[2]

---

[1] *White v. White*, 316 Neb. 616, 6 N.W.3d 204 (2024).

[2] *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020).

[3] In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[3]

[4] Which statute of limitations applies is a question of law.[4]

[5] The point at which a statute of limitations begins to run must be determined from the facts of each case, and the decision of the trial court on the issue of the statute of limitations normally will not be set aside by an appellate court unless clearly wrong.[5]

[6] An appellate court reviews the denial of a motion for a new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.[6] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[7]

## V. ANALYSIS

Rick argues that the district court erred when it failed to find he was owed $75,011.58 from Brent to settle the Property Valuation and Division Agreement. On damages, Rick and Sarah argue the district court erred in several ways, to wit, by finding the statute of limitations did not bar Brent's claims that predated March 31, 2017; by failing to find Brent's claims were settled and released as a result of Sarah's yearend

---

[3] *PSK v. Legacy Outdoor Advertising*, 318 Neb. 1, 13 N.W.3d 81 (2024).

[4] *Fitzgerald v. Community Redevelopment Corp.*, 283 Neb. 428, 811 N.W.2d 178 (2012).

[5] *Zook v. Zook*, 312 Neb. 128, 978 N.W.2d 156 (2022).

[6] *Schmid v. Simmons*, 311 Neb. 48, 970 N.W.2d 735 (2022).

[7] *Id.*

zeroing of the ledgers; by concluding that commodities trading was not a necessary part of the partnership, finding all improper ledger entries should be charged to Rick and Sarah, and adopting Meisinger's accounting; by finding liability for unjust enrichment when actual contracts existed; by finding Rick and Sarah jointly and severally liable; and by failing to grant their motion to alter and amend the judgment. For the reasons discussed below, we find no merit to any of these arguments. While the parties dispute whether the standard of review under the various theories of recovery determined below is clearly erroneous or de novo, we conclude that, under the facts of this case, it makes no difference. Under either standard, deferring to the district court's determinations of credibility, we find no error in its factual findings and affirm its judgment.

## 1. Statute of Limitations and "Complete Control"

We first address Rick and Sarah's argument that the district court erred in finding that the damages corresponding to acts of fraudulent misrepresentation and fraudulent concealment occurring before March 31, 2017, were not time barred under § 25-207(4). Section 25-207 states: "The following actions can only be brought within four years: . . . (4) an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud . . . ."

[7] "Discovery," in the context of statutes of limitations, refers to the fact that one knows of the existence of an injury or damage and a wrongful act.[8] "Discovery can be actual or constructive."[9] Constructive discovery occurs when the party discovers facts sufficient to put a person of ordinary intelligence

---

[8] See *Mai v. German*, 313 Neb. 187, 983 N.W.2d 114 (2023).

[9] John P. Lenich, Nebraska Civil Procedure § 5:11 at 206 (2025) (accrual of tort claim).

and prudence on an inquiry which, if pursued, would lead the person to discover the fraud.[10]

[8,9] Thus, we have explained that, pursuant to § 25-207(4), an action for fraud does not accrue until there has been a discovery of the facts constituting the fraud, or facts sufficient to put a person of ordinary intelligence and prudence on an inquiry which, if pursued, would lead to such discovery.[11] Whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand; and if the plaintiff omits to inquire, the plaintiff is then chargeable with all the facts which, by a proper inquiry, might have been ascertained.[12]

[10,11] In other words, notice of facts that under the circumstances would lead an ordinarily prudent person to make an examination which, if made, would disclose the existence of other facts is sufficient notice of such other facts.[13] If the fraud or mistake ought to have been discovered, the statute will run from the time such discovery ought to have been made.[14]

[12] Where an action is brought for relief on the ground of fraud after the lapse of 4 years from the date of the fraudulent transaction, it is the plaintiff's burden to allege and prove facts as to the failure to discover the fraudulent transaction and prosecute within 4 years.[15]

The court awarded damages under fraudulent misrepresentation and fraudulent concealment, which corresponded to false

---

[10] See, *id.*; *Fitzgerald v. Community Redevelopment Corp., supra* note 4.

[11] *Chafin v. Wisconsin Province Society of Jesus*, 301 Neb. 94, 917 N.W.2d 821 (2018).

[12] See *Norfolk Iron & Metal v. Behnke*, 230 Neb. 414, 432 N.W.2d 18 (1988).

[13] See *id.*

[14] *Henderson v. Forman*, 240 Neb. 939, 486 N.W.2d 182 (1992).

[15] See, *Lee v. Brodbeck*, 196 Neb. 393, 243 N.W.2d 331 (1976); *Jameson v. Graham*, 159 Neb. 202, 66 N.W.2d 417 (1954); *Westervelt v. Filter*, 2 Neb. (Unoff.) 731, 89 N.W. 994 (1902). See, also, Annot., 118 A.L.R. 1002 (1939).

ledger entries in a total amount of \$5,878,967.66, half of the \$900,000 diverted from the joint FNBN account, and the diversion of Brent's half of the distiller's grain proceeds before and after the Liquidation Agreement in a total amount of \$1,033,718.06. These encompassed all the damages corresponding to acts occurring before March 2017.

Rick and Sarah argue the district court erred in finding these damages were not barred by the statute of limitations, because Brent was on inquiry notice as early as 2016 that the ledger entries were false. Rick and Sarah explain that Brent "knew of the handwritten ledgers, large differences between the brothers, and the year-end settlements"[16] and that "Brent had only to ask to receive."[17] Instead, Brent "did not look."[18] We disagree with both Rick and Sarah's characterizations of the facts and of their legal significance.

The district court did not err in its various factual findings showing that Brent lacked constructive discovery of any claims against Rick and Sarah before March 31, 2017. Contrary to what Rick and Sarah suggest, there was no evidence that Brent knew before 2018 that there were any meaningful discrepancies in the ledgers. Brent was given copies of the ledgers, but the ledgers themselves did not reveal their falsity. The false entries were discoverable only by attempting to verify them with invoices received and kept by Sarah and payments from Rick's and Sarah's individual bank accounts. The district court found that "Rick and Sarah led Brent to believe that Brent could trust them" and that as a result, Brent reasonably "relied on the facts as Rick and Sarah presented them, continuing to match ledger expenses and not question Rick's dealings." Thus, Brent was not on notice that something was amiss that he should investigate.

---

[16] Brief for appellants at 38.

[17] *Id*. at 30.

[18] *Id*. at 31.

Also, the district court's findings show that Brent did not have the means of knowledge at hand had he tried to investigate. Specifically, the district court found that Rick had "exclusive control over the Partnership's finances and accounting" and that Rick "exclusively controlled the [cattle] inventory," keeping it in a locked safe and allowing Brent to see only copies rather than the originals. Further, the court found that Brent had no access to Rick's bank records, that "Sarah had complete control over Brent's side of the ledgers—deciding which expenses to pay and entering the expenses in the ledgers"—and that Sarah had "complete control over the ledger and inventory entries."

The district court found that Brent had "no way to know about the information Rick and Sarah concealed from him." Understandably, the court put little stock in Rick's and Sarah's assertions that they would have provided Brent with whatever documents he requested, which would have revealed their fraudulent activities. The district court did not find either Rick or Sarah to be particularly credible. It is also worth noting that Rick and Sarah denied Brent full access when he tried to examine and copy all partnership records.

[13] We recognize the district court did not make these factual findings in its discussion of the statute of limitations, but, instead, elsewhere in its order—because the court did not explicitly address constructive discovery. Rick and Sarah do not suggest, however, that we cannot affirm the district court's judgment if the facts found by the district court ultimately support it. An appellate court has the discretion to affirm, as it deems appropriate, a correct result that was reached below for the wrong reason.[19] We find that the district court correctly concluded that the damages incurred before March 2017 for fraudulent misrepresentation and concealment were not barred by the statute of limitations.

---

[19] *Hauxwell v. Middle Republican NRD*, 319 Neb. 1, 21 N.W.3d 34 (2025).

Under a different assignment of error, Rick and Sarah argue the district court's factual findings of "complete control" are erroneous because Rick and Sarah testified Brent had access to all records until after they commenced formal separation and because Brent made unspecified "admissions."[20] Rick and Sarah argue that "[w]ithout these findings, the Judgment falls," and that "[w]ith access established, Brent's claim for concealment fails."[21] We find no error respecting these factual findings, which call into question the validity of the district court's judgment on fraudulent concealment or any other claim. None of Brent's claims require exclusive control.

[14] To prove fraudulent concealment, a plaintiff must prove these elements: (1) The defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act or refrain from acting in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as a result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.[22]

[15] A fraudulent misrepresentation claim requires a plaintiff to establish the following elements: (1) A representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff

---

[20] Brief for appellants at 29, 30.

[21] *Id.* at 29, 31.

[22] *Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (2010).

should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result.[23]

The same facts that support Brent's lack of inquiry notice for purposes of the statute of limitations support his reasonable reliance on the material facts as Brent believed them to be and a conclusion that the false ledgers were not within Brent's reasonably diligent attention, observation, and judgment.

## 2. Annual Settlements

The district court did not err by rejecting Rick and Sarah's defense to all damages incurred before 2020, under the theory that the annual zeroing of the ledgers constituted annual settlements of all accounts and claims, which settlements could not later be rescinded.

[16,17] We have held that a settlement agreement is subject to the general principles of contract law.[24] To have a settlement agreement, there must be a definite offer and an unconditional acceptance.[25] Further, a fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties as to the essential terms and conditions of the proposed contract.[26]

[18] Rick and Sarah rely on *Fleischer v. Broders*[27] to support their settlement argument. In *Fleischer*, brothers and a third party in a partnership met annually to review their sales, purchases, and other records. The partners each testified that they were satisfied with the settlements at the end of each year.[28] Based on these settlements, we held that the parties could not

---

[23] *Henderson State Co. v. Garrelts*, 319 Neb. 485, 23 N.W.3d 444 (2025).

[24] *In re Estate of Wiggins*, 314 Neb. 565, 992 N.W.2d 429 (2023).

[25] *Smith v. King*, 29 Neb. App. 152, 953 N.W.2d 258 (2020).

[26] *Gibbons Ranches v. Bailey*, 289 Neb. 949, 857 N.W.2d 808 (2015).

[27] *Fleischer v. Broders*, 178 Neb. 723, 135 N.W.2d 5 (1965).

[28] *Id.*

reexamine the charges and credits agreed to in the absence of clear and convincing evidence of error or mutual mistake.[29] We said, """"The law favors and encourages settlements, and in the absence of fraud, error, or mistake, they should not be set aside."""""[30]

There was no evidence in *Fleischer*, outside of some small plain errors, that the end-of-year settlements contained misinformation, let alone evidence of fraud. Under the Restatement (Second) of Contracts, there is no meeting of the minds, and, thus, no effective assent, when there has been nondisclosure equivalent to a misrepresentation in a relationship of trust and confidence.[31] The Restatement (Second) of Contracts also explains:

> If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent.[32]

Unlike the partners in *Fleisher*, Rick and Brent did not meet to compare records at the end of every year, which records they then settled. Instead, Sarah, on her own, made the adjustments to the ledgers and gave credit to one brother or the other according to her calculations. As the district court found, Brent lacked the information necessary to assess the risks and benefits of settling and to meaningfully decide whether to settle the controversy. Furthermore, the court found that "[t]he ledger transactions involved fraud, deceit, oppression, and unconscionable conduct by Rick and Sarah." While Rick and Sarah argue that courts should not upset settled matters

[29] *Id.*

[30] *Id.* at 729, 135 N.W.2d at 9-10.

[31] See Restatement (Second) of Contracts § 161(d) (1981). See, also, *id.*, § 161, comment *a*.

[32] *Id.*, § 163 at 443.

between partners, that reluctance does not apply when one partner engages in fraudulent behavior.[33] Because Brent did not have full knowledge of the nature of Rick's ledger entries, there can be no settlement to bar his claims against Rick and Sarah. The district court properly denied Rick's defense of annual settlements.

### 3. Commodities Trading

The district court did not err in concluding that Rick's commodities trading activities should be excluded in determining Brent's damages under the various theories of recovery and causes of action presented.

[19] In arguing the district court erred, Rick and Sarah first focus on whether he had authority under Nebraska's Uniform Partnership Act of 1988[34] to engage in commodities trading on behalf of the partnership. Section 67-413 of the act states in part:

> (1) Each partner is an agent of the partnership for the purpose of *its business*. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority; and
>
> (2) An act of a partner which is not apparently for carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.

---

[33] See *Fleischer v. Broders, supra* note 27.

[34] Neb. Rev. Stat. § 67-401 et seq. (Reissue 2018).

(Emphasis supplied.) The scope of an agent's authority is a question of fact.[35]

Rick's focus on § 67-413 is misleading, because the court's findings were not only about Rick's ability to act as an agent of the partnership when engaging in commodities trading. It was also about whether Rick did, in fact, do so. The court found, summarized, that there was never any agreement between Rick and Brent to engage in commodities trading, but, also, that Rick did not engage in commodities trading for the partnership. The court found that Rick hid his personal commodities trading losses as "feed payments." Rick thereby fraudulently made the partnership cover Rick's personal losses associated with Rick's commodities trading that was conducted solely for Rick's own benefit. The district court found that Rick's commodities trading had "no place in the Partnership's business" and was instead Rick's personal endeavor. We agree.

## 4. Including All Unverified Feed Ledger Entries in Damages

We also find no merit to Rick and Sarah's contention that the district court erred in determining damages based on Meisinger's calculations instead of Weeder's. Rick and Sarah argue that Meisinger's calculations were inaccurate because "the feed ledger was not kept with pinpoint precision like a general ledger," including "legitimate amounts" consisting of round numbers, combinations of invoices, "and shortcuts that did not, by design, coincide precisely with checking accounts."[36]

[20] The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.[37]

---

[35] *Elting v. Elting*, 288 Neb. 404, 849 N.W.2d 444 (2014).

[36] Brief for appellants at 31.

[37] *Benjamin v. Bierman, supra* note 2.

The court gave more weight to Meisinger's calculations than Weeder's in part due to Weeder's inclusion of commodities as partnership expenses, including those misrepresented as feed expenses. As we have already discussed, the court properly found that commodities trading was not part of the partnership's business.

### 5. Weeder's Calculations Versus Meisinger's Calculations of Deficit for Cattle Under Sarah's, Cory's, and Braxten's Names

Somewhat similarly to their argument that the court should have used Weeder's calculations on Feed Ledger damages, Rick and Sarah argue the court erred in using Meisinger's calculations of damages for underpayments in the Cattle Ledgers for Sarah's, Cory's, and Braxten's cattle. Rick and Sarah point to Weeder's workpapers, entered into evidence at trial, as proving his figures were "mathematically correct" and generally assert that "Meisinger's are not."[38] However, Rick and Sarah do not point to evidence that Meisinger made mathematical errors in calculating the total sums underpaid on the Cattle Ledgers under the data Meisinger collected. We find no merit to this assignment of error.

### 6. Sarah's Joint Liability

Rick and Sarah's arguments that the court erred in imposing joint and several liability also lack merit. Rick and Sarah argue that Sarah could not be liable for partnership debt and imbalances, because she was not a partner. The court found Sarah liable under principles of conspiracy and aiding and abetting for those damages corresponding to Brent's claims of fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, conversion, breach of implied duties of loyalty and due care, and breach of contract.

---

[38] Brief for appellants at 32.

[21-24] A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means.[39] A claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act that constitutes a tort against the plaintiff.[40] A civil conspiracy is actionable only if the alleged conspirators actually committed some underlying misconduct.[41] That is, a conspiracy is not a separate and independent tort in itself; rather, it depends upon the existence of an underlying tort.[42]

[25-29] Liability for civil conspiracy is in substance the same thing as aiding and abetting liability.[43] A claim of aiding and abetting is that "in addition to persons who actually participate in [concerted wrongful action], persons who aid, abet, or procure the commission thereof, are subject to a civil action therefor."[44] We have previously said claims of both civil conspiracy and aiding and abetting are essentially methods for imposing joint and several liability on all actors who committed a tortious act or any wrongful acts in furtherance thereof.[45] Like conspiracy, aiding and abetting is not a tort in itself and requires an underlying actionable tort to be actionable.[46] Without an underlying tort, there can be no cause of action for

---

[39] *George Clift Enters. v. Oshkosh Feedyard Corp.*, 306 Neb. 775, 947 N.W.2d 510 (2020).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Bojanski v. Foley*, 18 Neb. App. 929, 798 N.W.2d 134 (2011).

[44] *Salem Grain Co. v. Consolidated Grain & Barge Co.*, 297 Neb. 682, 701, 900 N.W.2d 909, 924 (2017) (internal quotation marks omitted).

[45] *Id.*

[46] See *id.*

conspiracy to commit a tort or aiding and abetting the commission of a tort.[47]

Rick and Sarah do not specifically argue that there was insufficient evidence to support the district court's findings that Sarah engaged in concerted action with Rick toward an unlawful or oppressive object, or a lawful object by unlawful or oppressive means, or that there was insufficient evidence she aided, abetted, or procured the commission of the wrongful acts. Rick and Sarah argue only that Sarah cannot be held liable for anything other than what she owed under her and Braxten's cattle interests, because she was not a partner. Their elaboration on this assertion is somewhat difficult to decipher.

Rick and Sarah appear to argue that § 67-425 does not authorize actions against nonpartners. Section 67-425 provides:

(1) A partnership may maintain an action against a partner for a breach of the partnership agreement, or for the violation of a duty to the partnership, causing harm to the partnership.

(2) A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

(a) Enforce the partner's rights under the partnership agreement;

(b) Enforce the partner's rights under the Uniform Partnership Act of 1998, including:

(i) The partner's rights under section 67-421, 67-423, or 67-424;

(ii) The partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to section 67-434 or enforce any other right under sections 67-431 to 67-433 or 67-434 to 67-438; or

---

[47] See *Henderson State Co. v. Garrelts, supra* note 23.

(iii) The partner's right to compel a dissolution and winding up of the partnership business under section 67-439 or enforce any other right under sections 67-439 to 67-445; or

(c) Enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship.

(3) The accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law. A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.

Rick and Sarah also cite to *deNourie & Yost Homes v. Frost*[48] for the assertion that "Sarah may not be liable for the account imbalance as she had no duty as a non-partner to disclose Rick's personal data . . . ."[49] Finally, they cite to the Restatement (Second) of Torts[50] and *Palmer v. Maxwell.*[51]

[30] It is unclear what relevance *Palmer* has to the current case, as it concerned pleadings and denials and has not been cited to since it was decided. As for their reference to *deNourie & Yost Homes*, Rick and Sarah appear to refer to the section of that opinion where we explained, citing to the Restatement (Second) of Torts § 551, that a "party to a business transaction" can be liable to another party for failing to disclose a fact that he or she knows may justifiably induce the other to act or refrain from acting in the transaction, but only if the nondisclosing party was under a duty to the other to exercise reasonable care to disclose the fact at issue.[52]

[31,32] But even if we assume that, as a nonpartner, Sarah was not a party to the business transaction for purposes of

---

[48] *deNourie & Yost Homes v. Frost*, 289 Neb. 136, 854 N.W.2d 298 (2014).

[49] Brief for appellants at 39.

[50] Restatement (Second) of Torts § 551 (1977).

[51] *Palmer v. Maxwell*, 11 Neb. 598, 10 N.W. 524 (1881).

[52] *deNourie & Yost Homes v. Frost, supra* note 48, 289 Neb. at 148, 854 N.W.2d at 311.

liability under the Restatement (Second) of Torts § 551 and was therefore not liable for fraudulent concealment, such fraudulent concealment was not the only underlying claim for which the court found Sarah jointly and severally liable. The damages attributable to fraudulent concealment were also awarded under other theories of recovery, such as fraudulent misrepresentation and conversion. We note that while mere silence cannot constitute fraudulent misrepresentation absent a duty to disclose, half-truths can.[53] Under fraudulent misrepresentation, to reveal some information on a subject triggers the duty to reveal all known material facts.[54]

[33] Nothing in § 67-425 precludes this liability, as nothing in § 67-425 states that a partner cannot bring claims to vindicate rights existing outside of the partnership agreement or the Uniform Partnership Act of 1988, and statutes effecting a change in the common law should be strictly construed.[55] The court found Sarah jointly liable for the underlying torts of fraudulent misrepresentation, negligent misrepresentation, conversion, breach of implied duties of loyalty and due care, and breaches of contracts. Even if we assume breach of the Liquidation Agreement is encompassed exclusively by § 67-425, § 67-425 does not, on its face, preclude joint and several liability by a nonpartner for said breach under theories of conspiracy or aiding and abetting, which are not separate claims but acknowledge shared legal responsibility for the underlying legal claim.[56]

[34] In *deNourie & Yost Homes*, we also observed that "a claim of civil conspiracy requires the plaintiff to establish that the defendants had an expressed or implied agreement to commit an unlawful or oppressive act *that constitutes a tort against*

---

[53] See *Knights of Columbus Council 3152 v. KFS BD, Inc., supra* note 22.

[54] See, *id.*; Restatement, *supra* note 50, § 527.

[55] See *Smith v. Meyring Cattle Co.*, 302 Neb. 116, 921 N.W.2d 820 (2019).

[56] See *Salem Grain Co. v. Consolidated Grain & Barge Co., supra* note 44.

*the plaintiff*."[57] Generally, a breach of contract is not an underlying wrong that can give rise to a civil conspiracy.[58] But the question of when a claim is one for breach of contract and not a tort is a bit more nuanced than that, dependent upon whether the gravamen of the claim is a failure to perform a duty arising out of an agreement between the parties as opposed to a duty fixed by law independent of the contract.[59]

[35] We do not decide in this appeal whether there was an underlying tort supporting Sarah's joint liability for those damages falling solely under the court's discussion of breach of contract, however, because this was neither specifically assigned nor specifically argued on appeal. Mere citation to a case does not specifically argue every point of law discussed therein. Rick and Sarah's argument was marginally sufficient for this court to understand that they relied on *deNourie & Yost Homes* for the Restatement (Second) of Torts propositions already discussed, but it would be overreaching for this court to conclude that Rick and Sarah adequately challenged the court's judgment on the theory that some of the damages for which Sarah was found liable lacked an underlying tort.[60] We affirm the district court's determination that Sarah was jointly and severally liable.

### 7. Unjust Enrichment and Election of Remedies

Rick and Sarah assert the district court erred by finding that Brent could recover on an unjust enrichment theory in

---

[57] *deNourie & Yost Homes v. Frost, supra* note 48, 289 Neb. at 157, 854 N.W.2d at 316 (emphasis supplied).

[58] Joseph K. Leahy & Douglas K. Moll, The Revised Uniform Partnership Act § 404 (2025) (general standards of partner's conduct). See, also, Restatement (Second) of Torts § 876 (1979).

[59] See *Fuchs v. Parsons Constr. Co.*, 166 Neb. 188, 88 N.W.2d 648 (1958).

[60] See *deNourie & Yost Homes v. Frost, supra* note 48; Restatement, *supra* note 50; Restatement, *supra* note 54; Restatement, *supra* note 58.

conjunction with his contractual claims for breach of contract and breach of partnership duties of loyalty and fair dealing. We disagree. The district court found Rick and Sarah liable for unjust enrichment for Rick's $488,000 Feed Ledger entry, Rick's diversion of distiller's grain proceeds into his Liberty National Bank account, Rick's $900,000 withdrawal from the joint FNBN account, and Rick's diversion of $696,000 in proceeds from the sale of cattle under the Liquidation Agreement. The court found the false ledger entries, distiller's grain diversion, and $900,000 damages were all additionally recoverable under fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation, and conversion. The court found Rick's diversion of $696,000 recoverable under breach of contract, in addition to under unjust enrichment.

[36-40] Pursuant to the doctrine of election of remedies, a party pleading inconsistent theories of recovery may be required to elect between them.[61] A remedy in equity is inconsistent with a remedy at law, because a suit in equity will not lie when the plaintiff has a plain and adequate remedy at law.[62] A theory of recovery premised upon the existence of a contract is inconsistent with a theory premised on the lack of a contract.[63] However, election of remedies does not preclude a plaintiff from pursuing two causes of action where each action arose out of different obligations and different operative facts.[64] Election of remedies ensures that a party does not have double recovery for a single injury or is not made more whole by compensation that exceeds the actual damages sustained. Where several claims are asserted against several

[61] See *Vowers & Sons, Inc. v. Strasheim*, 254 Neb. 506, 576 N.W.2d 817 (1998).

[62] See *Southwest Trinity Constr. v. St. Paul Fire & Marine*, 243 Neb. 55, 497 N.W.2d 366 (1993).

[63] See *deNourie & Yost Homes v. Frost*, 295 Neb. 912, 893 N.W.2d 669 (2017).

[64] See *id.*

parties for redress of the same injury, only one satisfaction can be had.[65]

[41] Having found no merit to Rick and Sarah's challenges to the court's judgment under other theories of recovery, and there being no double recovery, we find that Rick and Sarah have not been harmed by the court's analysis of unjust enrichment. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[66] We therefore decline to address this assignment of error.

## 8. REAL ESTATE EQUALIZATION
## OF $75,011.58

Rick argues the court erred by failing to order $75,011.58 payable by Brent to Rick pursuant to Rick's counterclaim under the Property Valuation and Division Agreement, because that was the sum stated in the agreement and Rick testified it had not been paid. We disagree. The district court found that there was a failure of a condition precedent, namely, for Rick and Brent to negotiate and complete a final sale of Brent's ownership in the three limited liability companies, which barred Rick's entitlement to relief.

[42,43] A condition precedent includes a condition which must be fulfilled before a duty to perform an existing contract arises.[67] Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract.[68] The Property Valuation and Division Agreement provides: "The Equalization Payment will not be made until the parties negotiate and complete a final sale of

---

[65] *Id.*

[66] *In re Interest of Jackson E.*, 293 Neb. 84, 875 N.W.2d 863 (2016).

[67] *Weber v. North Loup River Pub. Power*, 288 Neb. 959, 854 N.W.2d 263 (2014).

[68] *Id.*

Brent's ownership in Sebade Trucking, . . . Bancroft Grain, . . . and Bancroft Custom Feeders." The language of the agreement shows a condition precedent that the district court found had not occurred. Rick does not specifically address this finding, but, in any event, we hold that the district court did not err by denying Rick's breach of contract counterclaim.

### 9. Motion to Alter and Amend

[44] Lastly, Rick and Sarah assign that the district court erred by failing to sustain their motion to alter and amend the judgment. Rick and Sarah's brief does not argue this assignment of error. In order to be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue it in the party's initial brief.[69] Because Rick and Sarah's appellate briefing does not argue this assigned error, we do not consider it, though we note that this assignment of error is duplicative of the errors already discussed above.

### VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.

Bergevin, J., not participating.

---

[69] *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).